# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
FLORENCE FERMAINTT, Administratrix Ad    :
Prosequendum for the Estate of Thomas Lawlor,    :
Deceased    :
   :
         Plaintiff,    :
   :       Civil Action No. 06-05983 (JAP)
      v.    :
   :       **OPINION**
MCWANE, INC., ATLANTIC STATES CAST    :
IRON PIPE COMPANY; MARK NEETZ; JOHN    :
DOE CORPORATIONS ONE THROUGH TEN,    :
   :
        Defendants.    :
_____:

PISANO, District Judge.

       Plaintiff Florence Fermaintt, administratrix for the estate of Thomas Lawlor, has brought

this action against McWane, Inc, Atlantic States Cast Iron Pipe Co., and Mark Neetz

("Defendants") for the tragic workplace death of Thomas Lawlor.  Plaintiff alleges claims of

negligence, breach of warranty, strict liability, intentional tort and wrongful death against

Defendants.  This Court has original jurisdiction to hear this dispute pursuant to 28 U.S.C. §

1332 because this case is a civil action between citizens of different states and the amount in

controversy exceeds $75,000.

       Presently before the Court is Defendants' summary judgment motion.  The Court heard

oral arguments on October 29, 2009.   For the reasons set forth herein, the Court grants

Defendants' summary judgment motion.

I.      **Background**[1]

On January 20, 2005, Thomas Lawlor was fatally injured when he was struck by a fallen cast iron pipe during the course of his employment with Atlantic States Cast Iron Pipe Co. ("ASCIP").  ASCIP, a division of McWane, manufactures iron pipes and fittings.  ASCIP employed Lawlor from 1999 until January 20, 2005.

a.      Cast Iron Pipe Manufacturing Process

ASCIP manufactures cast iron pipes from raw material and scraps made mostly of iron. To begin the process, raw materials are picked up by a crane from the scrap yard and dropped into the cupola furnace on top of the building.  The iron is then melted down and poured into casting machines to form the pipes.  These new pipes pass through an annealing furnace or oven to strengthen the pipes and then through a "quencher" which cools the pipes with water.  After the quencher, the pipes are set on steel rails and proceed through a weigh station, grinding station, cut-off station and lastly an inspection station.  After passing inspection, the pipes are sent to the "Test Press Area" for pressure testing to locate any cracks in the pipe casing.  The Test Press Area is separated from the inspection station by tracks on which Transfer Car #2 is used to bridge the gap between rails from the inspection station to the Test Press Area and to transport pipes to storage rails outside the plant.  The Test Press Area consists of a Large Test Press which handles pipes between four and twenty-four inches of inner diameter and a Small Test Press which handles pipes with an inner diameter of six and twelve inches.  The Test Press Area has two sets of rails which lead to either the Large Test Press or Small Test Press.  There

---

[1] The background is drawn from the undisputed facts set forth in Plaintiff's Rule 56.1 Statement of Material Facts, Defendants' Rule 56.1 Statement of Material Facts, Defendants' Response to Plaintiff's Rule 56.1 Statement of Material Facts, and Plaintiff's Response to Defendant's Rule 56.1 Statement of Material Facts as well as referenced exhibits.  The Court notes that Plaintiff has painted Defendants' conduct with a broad brush, including voluminous submissions of criminal indictments and convictions as well as experts' testimony.  Therefore, the Court has isolated the factual inquiry herein to facts applicable to the legal standard of overcoming the Worker's Compensation bar.

are two stairs leading from the ground level to the Large Test Press platform which are located

north of the Large Test Press rails.

  The Operator of Transfer Car #2 is responsible for sorting the pipes after inspection,

lining up the Transfer Car with the inspection side rails, lowering the guard to allow the pipes

onto the Transfer Car, moving the Transfer Car to either the outside storage rails, Large Test

Press or Small Test Press, and finally lowering a guard on either side of the Transfer Car so the

pipes can roll off the Transfer Car.  Depending on the diameter of the pipes, twenty or more

pipes can fit on the Large Test Press Rails each with a weight between approximately 260 and

2,400 pounds.  The Test Press Rails have a slight downward slope in the direction of the Test

Press.  Pl.'s Stmt. Mat. Facts, ¶ 25.  Therefore, due to gravity, the pipes on the Test Press Rail

cannot roll backwards away from the Test Press and towards Transfer Car #2 absent some

external force.  Holecek Dep., 324-25, Coyle Cert., Ex. T.

  Prior to Lawlor's accident, ASCIP had installed an "anti-rollback device" on the right-

side rail leading to the Large Test Press near Transfer Car #2.  The anti-rollback device is a piece

of steel nine inches in length designed to pivot down to allow pipes to roll down towards the Test

Press.  The device extends 4.5 inches above the Test Press Rails in its vertical position.  After

pipes pass over the anti-rollback device, the device automatically pivots back to a locked upright

position preventing the pipes from rolling backwards.  In order for the anti-rollback device to be

effective, a rolled pipe cannot rest on the device in its horizontal position, but must pass the top

of the device in order to activate the locking mechanism.  On a daily basis, approximately one to

ten times per day, employees rolled pipes onto the Small and Large Test Press rails disabling the

anti-rollback device.  Vial Dep., 46:22-24, Coyle Cert., Ex. E.   When this occurred, employees,

in particular Mr. Vial the transfer car operator, were in the habit of placing a triangular wooden

wedge under the pipe as a safety procedure.  Vial Dep., 49:20-50:10, Coyle Cert., Ex. E.  Prior to

the installation of the anti-rollback device, ASCIP only utilized the wooden wedge for safety and

considered the wedge a good way to prevent pipes from rolling backwards.  Fairchild Dep., 60:1-

17, Coyle Cert., Ex. B.

        b.   <u>Pre-Accident OSHA Violations</u>

Prior to Lawlor's accident, OSHA never issued a citation to ASCIP for any operations or

procedures in place at the Test Press or for allowing pipes to be rolled onto the anti-rollback

device so that it was held in a horizontal position and disabled.  Additionally, OSHA never

issued a citation to ASCIP for using wooden wedges when the anti-rollback device had become

disabled or for failing to use a wooden wedge when the anti-rollback device had become

disabled.   Further, OSHA never issued a citation to ASCIP for moving the Transfer Cars when

the anti-locking device had been disabled or for having pipes overhanging the Large Test Press

Rails so they blocked the exit from the Test Press platform.

        c.   <u>Prior Accidents at ASCIP</u>

ASCIP recorded one injury due to falling pipes sustained during the ten years prior to

Lawlor's accident.  On April 4, 2001, Nicholas Girou, an employee of ASCIP, was injured when

an eight inch pipe rolled off a saw rail in the finishing department and struck his head and left

hip.  Girou sustained a compression fracture and was hospitalized for four days.  Girou's injury

did not occur as a result of a disabled anti-rollback device.

        d.   <u>Circumstances of Lawlor's Accident</u>

Lawlor worked in the Large Test Press area at the time of the accident as a Test Press

Operator.  Lawlor had held this position for six years.  On January 20, 2005, Lawlor was the Test

Press Operator and Carlos Vial was operating Transfer Car #2.  As Test Press Operator, Lawlor

was responsible for assisting Vial with rolling pipes onto the outside storage rails with an "F-bar" when needed.   On the day of the accident, Vial loaded Transfer Car #2 with pipes from the inspection line and then loaded some onto the Large Test Press rails.  In loading the pipes unto the Large Test Press rails, Vial stacked the pipes such that they were lying horizontal over the anti-rolling device disabling the safety feature.  Vial then placed a wooden wedge against the last pipe on the Large Test Press rails before proceeding outside with the remaining pipes on Transfer Car #2.   *See* Vial Dep. 163:21-164:22, DuPont Cert., Ex. J.  At this point, there was another pipe lying on the ground between Transfer Car #2 tracks and the base of the Large Test Press that partially blocked the entrance to the Large Test Press platform.

Next, Vial asked his supervisor Rosario Parinello for help rolling the pipes from Transfer Car #2 to the outside storage rails.  Parinello sent Lawlor to help Vial roll the pipes.  Following these orders, Lawlor walked along the Transfer Car #2 tracks and then in the direction back to the stairs leading to the Large Test Press platform.  At this time, Lawlor was struck by a falling pipe from the Large Test Press rails.  The pipe was thirteen inches in diameter and weighed around seven hundred pounds.  Lawlor was found at the base of the stairs at the Large Test Press lying on his back with the pipe on his chest and both feet under the bottom step leading to the platform.

Following the accident, OSHA investigated the ASCIP facility and initially issued two citations under 29 C.F.R. 1910.36(g)(2) and 1910.37(a)(3).  OSHA subsequently removed the 29 C.F.R. 1910.36(g)(2) citation.  The only citation then was based on the fact that the Test Press Stairway was partially blocked by pipes.

e.   Procedural History

On November 6, 2006, Plaintiff commenced this action in the Superior Court of New

Jersey, Law Division, Warren County alleging negligence against Defendants.  Additionally,

Plaintiff brought claims of breach of warranty, strict liability, intentional tort and wrongful death.

On December 13, 2006, the case was removed to the United States District Court pursuant to 28

U.S.C. § 1446(a).  On January 22, 2007, Plaintiff filed a First Amended Complaint.

II.   **Discussion**

   **A.  Summary Judgment Standard**

To prevail on a motion for summary judgment, the moving party must establish "that

there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  The district court must determine whether disputed issues

of material fact exist, but the court cannot resolve factual disputes in a motion for summary

judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

In determining whether a genuine issue of material fact exists, the court must view the

facts in the light most favorable to the non-moving party and extend all reasonable inferences to

that party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986);

*Stephens v. Kerrigan*, 122 F.3d 171, 176-77 (3d Cir. 1997).  The moving party always bears the

initial burden of demonstrating the absence of a genuine issue of material fact, regardless of

which party ultimately would have the burden of persuasion at trial.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986).  Once the moving party has met its opening burden, the non-moving

party must identify, by affidavits or otherwise, specific facts showing that there is a genuine

issue for trial.  *Id.* at 324.  Thus, the non-moving party may not rest upon the mere allegations or

denials of its pleadings.  *Id.*  "[T]he plain language of Rule 56(c) mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

Once the moving-party has demonstrated to the court the absence of a material fact at issue, the Supreme Court has stated that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . ." *Matsushita*, 475 U.S. at 586-87 (citations omitted).  In other words, "[i]f the evidence [submitted by the non-moving party] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The Supreme Court has specifically recognized that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses, and [] that [the rule] should be interpreted in a way that allows it to accomplish this purpose." *Celotex*, 477 U.S. at 323-24.  Thus, "[w]hen the record is such that it would not support a rational finding that an essential element of the non-moving party's claim or defense exists, summary judgment must be entered for the moving party." *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 341 (3d Cir. 1990).

### B.   Legal Analysis

#### a.   The *Millison* Standard

The Court recognizes the tragedy that has occurred here.  Generally when injuries or death occur in the workplace, the exclusive and sole remedy for employees and their legal representatives is the Workmen Compensation system.  *See* N.J. Stat. Ann. § 34:15-8.  The Workmen Compensation system arose out of desire to protect employees from the increasing number of industrial accidents and the inadequacies of the common-law tort remedies.  *Millison*

*v. E.I. Du Pont de Nemours & Co.*, 101 N.J. 161, 174 (1985).  New Jersey's Workmen

Compensation system involves a "trade-off whereby employees relinquish[] their right to pursue

common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits

whenever they suffer[] injuries by accident arising out of and in the course of employment."

*Millison*, 101 N.J. at 174.  While this "trade-off" exists in most cases, the legislature has created

exceptions where an employee does not forfeit his right to pursue a remedy from his employer.

For instance, an employer who engages in an "intentional wrong" causing the workplace injury

or death of an employee is susceptible to common law suit by the employee.  N.J. Stat. Ann. §

34:15-8.

  The New Jersey Supreme Court defined what constitutes an "intentional wrong" in its

decision in *Millison*.  In establishing the level of egregious conduct that amounts to an

"intentional wrong," the court created a two-prong test: a conduct and context prong.  First, the

conduct of the employer must be such that there was "substantial certainty" of injury or death.

*Millison*, 101 N.J. at 178.  "The mere knowledge and appreciation of a risk—something short of

substantial certainty—is not intent." *Id.* at 177 (quoting W. Prosser and W. Keeton, *The Law of*

*Torts*, § 80 at 569 (5th ed. 1984)).  Also, a defendant does not engage in an intentional wrong

when he is negligent by acting in the belief or consciousness that the act is causing an

appreciable risk of harm to another or when the defendant is acting recklessly or wantonly facing

even a greater risk.  *Id.*  The court recognized that in adopting a substantial certainty standard

"that every undertaking, particularly certain business judgments involve some risk, but that

willful employer misconduct was not meant to go undeterred."  *Id.* at 178.  Therefore, while "the

distinctions between negligence, recklessness, and intent are obviously matters of degree, albeit

subtle ones," courts must determine whether "virtual certainty" of injury or death existed under the conduct prong.  *Id*. at 178.

In addition to evaluating conduct, courts must evaluate the context in which the conduct takes place.  Most importantly, courts must determine whether "the resulting injury or disease, and the circumstances in which it is inflicted on the worker fairly may be viewed as a fact of life of industrial employment, or is it rather plainly beyond anything the legislature could have contemplated as entitling the employee to recover only under the Compensation Act[.]"  *Id*. at 179.  Therefore, in order for an employer's conduct to amount to an "intentional wrong," a court must find that the "employer acted with knowledge that injury was substantially certain to occur [and] also whether the injury and circumstances surrounding it were part and parcel of everyday industrial life or plainly outside the legislative grant of immunity."  *Laidlow v. Hariton Machinery Co., Inc.*, 170 N.J. 602, 614-15 (2002).  Further, "evaluat[ing] whether the context prong has been satisfied is 'solely a judicial function.'"  *Mull v. Zeta Consumer Prods.*, 176 N.J. 385, 392 (2003).  "Thus, if the substantial certainty standard presents a jury question and if the court concludes that the employee's allegations, if proved would meet the context prong, the employer's motion for summary judgment should be denied; if not, it should be granted."  *Id*.

Since the analysis required in this case involves a factual inquiry to satisfy the conduct and context prong, *Millison* and its progeny provide insight into the factors courts consider when determining whether an employer's conduct constitutes an intentional wrong.  In *Millison*, plaintiff employees brought suit claiming their employer and its doctors intentionally harmed them by deliberately exposing them to asbestos and then concealing medical information from the employees that indicated contracted diseases from the exposure.  *Millison*, 101 N.J. at 165-66.  The New Jersey Supreme Court first found that simply exposing the employees to the risk of

asbestos was not an intentional wrong; however, the fact that the employer actively failed to inform employees of the discovered illness created substantial certainty that the employee would suffer harm. *Id.* The court noted "a difference between, on one hand, tolerating in the workplace conditions that will result in a certain number of injuries or illness, and on the other, actively misleading the employees who have already fallen victim to those risks of the workplace." *Id.* at 182. Because this intentional deceit was beyond the intent of the legislature in creating the Workmen's Compensation Act, the court denied the employer's motion for summary judgment.

The New Jersey Appellate Division applied the *Millison* test in *Mabee v. Borden* in determining whether an employer's intentional disabling of safety reaches the level of an intentional wrong. *Mabee v. Borden, Inc.*, 316 N.J. Super. 218, 221 (App. Div. 1998). In this case, the employee sustained severe injuries to his hand when he was cleaning excess glue from a machine whose safety device had been removed. *Id.* at 222. Prior to the accident, another employee had been injured by the machine prompting the employer to install both a metal plate and Plexiglas enclosure for safety protection. *Id.* At some point between these two accidents, the employer had the metal plate removed and installed a "bypass switch" allowing the machine to operate in maintenance mode with the Plexiglas shield lifted. *Id.* at 223. Although the bypass was intended to only be utilized by maintenance personnel, the bypass was activated ninety-five to ninety-eight percent of the time because it lowered the incidents of shutting down the machine for fifteen to twenty minutes for cleaning. *Id.* Prior to the accident, the employer supported a focus on increased and quicker production encouraging operators to utilize the switch. *Id.* In reviewing the trial courts grant of summary judgment, the appellate division dismissed the notion that "removal of a safety device presents a per se prima facie case of 'intentional wrong' . . .

because a case-by-case" determination is necessary.  *Id.* at 230-31.  Instead, the court reversed

the grant of summary judgment because the employer removed the safety guard with knowledge

of prior accidents without the safety device and the legislature could not have "expected that

employers would deliberately alter components of its system or remove safety devices because

of profit or motive or production concerns." *Id.* at 233.

      In addition to intentionally disabling safety equipment for profit and knowledge of prior

accidents, prior OSHA citations and misrepresentations have factored into breaching the high

threshold of "intentional wrong." *Crippen v. Cent. Jersey Concrete Pipe Co.*, 176 N.J. 397

(2003).  In *Crippen*, an employee was killed when he fell into a sand and gravel hopper.  *Id.* at

400.  The employee was responsible for loading sand and gravel into seventeen-foot deep

hoppers.  *Id.*  In order to activate the control levers, the employee about ten times a day had to

walk on a single two-inch by ten-inch wooden plank and stand on an unsecured ladder resting on

the plank.  *Id.*  Prior to Crippen's death, OSHA cited the employer for "serious" violations

relating to the conditions that caused Crippen's death.  *Id.* at 402-03.  OSHA ordered the

employer to abate the conditions no later than sixteen months prior to Crippen's accident.  *Id.*

The *Crippen* court found that the employer's conduct satisfied the conduct prong based on the

employer's knowledge of the dangerous conditions found by OSHA and the fact they

deliberately failed to correct the violations and intentionally deceived OSHA into believing the

violations had been abated.  *Id.* at 410.  Additionally, the court found the context prong satisfied

because it was never the legislature's intent that deliberate deception of OSHA and disregarding

safety hazards would constitute a part of everyday industrial life.  *Id.* at 411.

      Further, in *Laidlow v. Hariton Machinery Co. Inc.*, the New Jersey Supreme Court found

that there was substantial certainty injury would occur when the employer deliberately removed

a safety guard from a dangerous machine to enhance production and willfully deceived OSHA regarding the use of the safety device.  170 N.J. 602 (2002).   In *Laidlow*, the plaintiff sued his employer for intentional tort after suffering an injury when his hand became caught in a rolling mill which he was operating in the course of his employment with defendants.  *Id*. at 606-607.  Because the rolling mill required a manual feed into a nip point, the employer prior to the accident installed a safety guard.  *Id*. at 620.  The safety guard, however, over a period of thirteen years was disabled by the employer nearly 100% of the time despite numerous reported "close-calls."  *Id*.  In fact, Laidlow requested three times prior to his accident that the safety guards be restored because the machine was too dangerous.  *Id*. at 621.  Despite near miss accidents, the employer only activated the safety guards during OSHA inspections.  *Id*.  In considering the totality of the circumstances, the *Laidlow* court found intentional wrongful conduct because the employer "deliberately remove[d] a safety device from a dangerous machine to enhance profit or product with substantial certainty that it [would] result in death or injury to a worker, and also deliberately and systematically deceive[d] OSHA into believing that the machine [was] guarded."  *Id*. at 622.  After satisfying the context prong, the court noted that the legislature would never have considered the employer's actions to constitute a simple fact of industrial life.  *Id.*

        Therefore, after reviewing *Millison* and its progeny, a finding of "substantial certainty" of injury or death to satisfy the context prong requires the consideration of 1) prior accidents or injuries stemming from the machinery in question, 2) the defendant's intentional disabling of safety equipment for profit or production, and 3) prior OSHA citations and deliberate misrepresentations to OSHA.  If after considering these factors it is substantially certain that a worker would suffer injury, the court must then consider the context prong to determine if the

injury was outside the purview of the legislature's consideration in immunizing employers under the Worker's Compensation Act.

### i.  **Prior Accidents or Near Misses**

In considering the first factor in this case, Plaintiff has failed to establish the existence of any prior accidents or injuries in regards to falling pipes from the Large Test Press due to the disabling of the anti-rollback device.  In the ten years preceding Mr. Lawlor's accident, the only reported injury caused by a falling pipe in all six of McWane's facilities was the compression fracture sustained by Girou.  Girou was injured when an eight inch pipe rolled off a saw rail in the finishing department and struck his head and left hip.  This injury, however, is distinguishable from Lawlor's accident as it did not occur at the Large or Small Test Press or rails.  Further, the rails which caused Girou's accident did not have anti-rollback devices and were not sloped away but downward towards the employee.  Hence, this injury did not give Defendant's prior notice of the dangerous condition of falling pipes from the Test Press rails due to disabled safety devices.

To overcome the lack of evidence of prior accidents, Plaintiff first argues that another worker "Jiminez" was injured due to a pipe falling from the rails.  In an OSHA interview, Timothy Panaski testified that he believed one person named Jiminez hurt his finger due to falling rails.  However, in a later deposition when asked about this testimony, Panaski stated that he did not know what he was referring to and did not remember a worker at ASCIP with the name Jiminez.  Panaski Dep., 72:10-73:12, Coyle Supp. Cert., Ex HH.   Further, Plaintiff argues that "near misses" occurred prior to Lawlor's accident "every day" and "to quite a few guys" when pipes fell from the Large Test Press rails and nearly hit workers.  Pl.'s Stmt. Mat. Facts, ¶ 70.  While this statement is consistent with Gary Premus's testimony, Premus explained that he

considered a near miss to be "fingers getting pinched in a pipe, machine or a pipe falling off the rail which happened on the outside rails a lot."  Premus Dep., 89:15-18, Coyle Supp. Cert., Ex. II.  Additionally, Premus was only able to specifically identify one incident where an employee was nearly hit by a falling pipe, but didn't know the name of the individual.  Premus Dep., 90:16-18, Coyle Supp. Cert., Ex. II.  Notably, Plaintiff does not have testimony of any employees who experienced "near misses" in light of the allegation that they happened "every day."[2]   Considering the lack of reported accidents and the questionable and vague testimony regarding "near misses," the evidence does not show the existence of prior accidents involving the same machinery or procedure which caused Lawlor's death to indicate that ASCIP could have been substantially certain an injury would occur.  At best, Plaintiff has shown that ASCIP generally should have been aware of the risk that falling pipes could occur and could cause injuries in a pipe manufacturing plant.  Therefore, the lack of substantiated and relevant prior accidents and near misses weighs in favor of the fact that ASCIP did not have substantial certainty that an injury would occur.

### ii. **Intentional Disabling of Safety Devices for Profit**

The second factor considered in the conduct prong is whether ASCIP intentionally disabled safety devices to increase profit and production.  While it was not ASCIP's formal policy to permit the disabling of the anti-rollback devices, Plaintiff argues that management routinely directed employees to disable anti-rollback devices and, in the alternatively, in the absence of such directions ASCIP at least knowingly tolerated employees disabling of the devices.  Assuming that Plaintiff can overcome evidentiary issues in their facts and show that

---

[2] Plaintiff argues that Mr. Ledee testified that pipes fell regularly from the rails at the cement line into the tracks of Transfer Car #4 and #5.  Pl.'s Stmt. Mat. Facts, ¶ 70.  Ledee attributes the falling pipes specifically to the vibrations that occur on the cement line, not to the disabling of the anti-rollback device or the use of a wooden wedge.  Ledee Dep. 44:18, DuPont Cert., Ex. G.  Since the cement line is not relevant to the circumstances of Lawlor's accident, Ledee's testimony as to falling pipes is not relevant.

Defendants ordered the disabling of the anti-rollback devices for profit motive, Defendants'

actions even then do not amount to the standard for intentionally disabling devices established in

*Mabee* and *Laidlow*.  In *Mabee*, the employer installed a switch to bypass a safety mechanism so

employees were working without the safety device 95-98% of the time.  *Mabee*, 316 N.J. Super.

at 223.  Similarly, in *Laidlow*, the employer implemented wiring to block a safety guard from

operating 100% of the time the machine was in use.  *Laidlow*, 170 N.J. at 620.   In contrast to

*Mabee* and *Laidlow*, ASCIP made no efforts to create a mechanism to permanently disable the

anti-rollback devices.  In fact, the anti-rollback devices at the Large and Small Test Press were

only disabled about 1% of time.[3]  This case is further distinguishable from the case law in that

ASCIP provided a secondary substitute safety device of the wooden wedge to protect its

employees.  Vial testified that he used a wooden wedge to secure the pipes whenever the anti-

rollback device was disabled.  Def.'s Stmt. Mat. Facts, ¶ 44.  Notably, ASCIP utilized wooden

wedges exclusively prior to the installation of the anti-rollback devices and OSHA made no

findings that wooden wedges did not pass its safety requirements.  Therefore, even taking

Plaintiff's allegations as true, the evidence provided doesn't show that ASCIP intentionally

disabled safety devices for profit.

### iii.    OSHA Citations and Misrepresentations

        The final factors considered in the conduct prong are prior OSHA citations and any

deliberate misrepresentations to OSHA.  Here, Plaintiff has not presented any evidence of prior

OSHA citations issued to McWane regarding the equipment and procedures involved in

Lawlor's accident or of any deliberate misrepresentations to OSHA made by McWane regarding

---

[3] Mr. Vial testified that he would roll pipes horizontally over the anti-rollback device disabling the devices more
than once but not more than ten times a day.  Def.'s Stmt. Mat. Facts, ¶ 42-43.  Evidence provided suggests that
when the facility is working in full capacity ASCIP can produce 180 pipes per hour over two shifts and during the
week leading up to Lawlor's accident ASCIP averaged 1,928 pipes a day.  Def.'s Stmt. Mat. Facts, ¶ 30-31.
Assuming that Vial disabled the device 10 times a day and about 900 pipes run through the Test Press every shift,
then the anti-rollback device is only disabled 1% of the time.

their equipment or procedures.  Furthermore, after Lawlor's accident, OSHA did not issue

citations regarding ASCIP's procedures regarding disabling anti-rollback devices or the use of a

wooden wedge to replace such devices.  The only OSHA citation issued regarding Lawlor's

accident was because "exit routes were not kept free and unobstructed."   In determining

"substantial certainty," the *Crippen* and *Mull* courts relied heavily on the employer's failure to

correct OSHA violations that would have prevented the plaintiff's accident and misrepresenting

to OSHA that such procedures had been corrected before the accident.  Here, there is no

evidence that ASCIP had knowledge or notice from OSHA of any dangerous conditions or

proactively tried to deceive OSHA about such a condition.

　　　　In an attempt to make-up for any pre-accident OSHA citations or deception, Plaintiff

focuses on citations and abatements issued by OSHA post-accident and makes allegations that

ASCIP interfered and altered the accident scene prior to OSHA's arrival.  The case law,

however, is clear that the focus of the inquiry is the employer's pre-accident notice of the

dangerous condition by OSHA and intentional deception of OSHA in order to be able to

continue with the dangerous condition.  Plaintiff's arguments then are not relevant to the extent

that they relate only to OSHA's involvement post-accident and provide no insight into ASCIP's

notice that a dangerous condition existed prior to Lawlor's death.   Further, Plaintiff argues that

Defendants should be equitably estopped from arguing a lack of pre-accident OSHA violations

since McWane is in the "practice of lying to OSHA, concealing workplace injuries and

workplace complaints and tampering with OSHA investigations."  Pl.'s Opp. Br., at 27.  In

support of this proposition, Plaintiff cites to criminal indictments from 2003 against ASCIP

which included obstructions of OSHA investigations.  However, the Court as stated during oral

arguments will not consider these criminal matters for evidentiary reasons because they pre-date

16

Lawlor's accident, are not relevant to the Lawlor accident and the Test Presses, and are highly prejudicial.  Therefore, the lack of pre-accident citations from or deception of OSHA weighs in favor that ASCIP did not have substantial certainty that an injury would occur.

iv.    <b>Context and Conduct Prongs Determinations</b>

Considering the totality of the circumstances, a reasonable jury could not conclude that ASCIP was substantially certain that disabling the anti-rollback devices would result in injury to Lawlor in light of the lack of prior accidents and near misses, lack of evidence showing ASCIP intentionally disabled the safety devices to increase profit, and lack of pre-accident OSHA citations and misrepresentations.  At best, ASCIP's conduct could be categorized as negligent or reckless because there is no evidence that ASCIP had "virtual certainty" of injury or death under the conduct prong.  Hence, the conduct prong is not satisfied.  Likewise, the context prong is not satisfied because the legislature would consider an accident based such as this a fact of industrial life in a pipe manufacturing plant.  As such, Plaintiff has not shown that Defendants' conduct equates to an intentional wrong under the Workmen's Compensation Act to qualify for removal of the bar from suit.  Therefore, all claims are barred by the Workmen's Compensation Act and summary judgment is granted to Defendants.

**III.    Conclusion**

For the reasons set forth above, the Defendants' motion for summary judgment is granted.  All claims in Plaintiff's complaint are dismissed pursuant to the Defendants' motion.  An appropriate Order accompanies this Opinion.

/s/ JOEL A. PISANO<br>United States District Judge

Date: March 5, 2010